## Wytheville.

## PENNSYLVANIA RAILROAD COMPANY v. JENKINS.

### June 8, 1916.

#### Absent, Cardwell, J.

1. NEGLIGENCE—*Duty of Care for One's Self—Ordinary Care.*—The fact that the engineer of a train that was pulling a dead engine as a part of his train may have promised the passenger accompanying the dead engine to stop the train in a safe place to enable him to inspect said engine, did not relieve the passenger from the obligation to use ordinary care for his own safety.

2. NEGLIGENCE—*Contributory Negligence—Case at Bar.*—When the negligence of the plaintiff proximately contributes to his injury there can be no recovery. In the case at bar, the physical facts show that if the plaintiff had looked and listened he would necessarily have known of the approach of the train which inflicted the injury complained of, and his negligence is accentuated by his admission that he did not look and did not hear the approaching train.

Error to a judgment of the Hustings Court, Part II, of the city of Richmond, in an action of trespass on the case. Judgment for the plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*Munford, Hunton, Williams & Anderson* and *Thomas B. Gay,* for the plaintiff in error.

*O'Flaherty, Fulton & Byrd,* for the defendant in error.

WHITTLE, J., delivered the opinion of the court.

In an action for personal injuries there was a verdict for the defendant in error against the plaintiff in error for $15,000, upon which the judgment under review was rendered.

There are a number of assignments of error, but in the view that we take of the case it will only be necessary to notice the first—that the trial court erred in overruling the defendant's motion to set aside the verdict as contrary to the law and the evidence.

Jenkins, the plaintiff below, was an employee of the Richmond branch of the American Locomotive Works, and was directed to accompany two "dead" locomotives (new engines) moving on their own wheels as freight from Richmond, Virginia, to Chicago, Illinois, for delivery to the Chicago, Rock Island and Pacific Railway.   His fare as a passenger was paid, but before accepting transportation he signed a paper which advised him that "as freight trains were not as safe as passenger trains, and did not stop at station platforms, in riding upon and getting to, on and from such trains" he was liable to be exposed to unusual risks and dangers.

The two dead engines were being hauled by and formed parts of a long through freight train.   One was placed about eight or ten cars in rear of the locomotive drawing the train.   Then followed three or four freight cars, to the last of which the second dead engine was coupled, and behind it there were a number of other freight cars and the caboose.   Plaintiff, traveling in the second dead engine, left Richmond on May 3, 1913, by way of Altoona, Pennsylvania, leaving the latter city about four o'clock on the morning of May 9.   Up to that time the dead engines had given no trouble, but in running down the mountain toward Johnstown they began to get hot, and at a point about

eight miles east of Conemaugh yard plaintiff signalled the conductor, who was riding in the caboose, to come forward to the dead engines.    There is some conflict between the testimony of plaintiff and that of the conductor and brakeman as to the precise purport of the conversation that ensued, and the former's version of it must be accepted.    He says in substance that he complained of the rate of speed at which they had been traveling, and stated to the conductor that the engines were getting heated, and that he would cut them out of the train if the speed was continued.    The conductor then remarked, that it was a hard matter to hold them down to the speed limit going down the hill.    Thereupon, plaintiff asked:  " 'Can't you put these engines off here on a side track?' he said no not at that place; I asked him then how far was the side track, and I think he told me about eight miles.    I said, 'Well, I will trust them to there.' "    Plaintiff said they were on the mountain, and the crew objected to the stop; but he was going to put the dead engines in there but there was no side track.    He wanted to cut them out of that train and put them in a slow train.    He also stated that the conductor said, "We will go down here in a safe place, where you can examine these engines, and if it is necessary and you want to cut them out you can do so."    It is of importance to note that the main line of defendant's road on which they were then traveling consisted of four through tracks, numbered respectively from south to north, one to four.    The two outside tracks are freight service tracks.    No. 1 is an east-bound track, No. 4 a west-bound track.    The two inside tracks are passenger service tracks.    No. 2 an east-bound track, and No. 3 a west-bound track.    The train in question was running westwardly on No. 4.

When the train reached Conemaugh yard, a distance of six or eight miles from the point where the previous stop had been made, it was stopped at the yard office at the east side of the yard, and the conductor, in accordance with his understanding of plaintiff's purpose to cut out the dead engines, went into the office, communicated plaintiff's wishes to the yard master, and was ordered to take the engines to the west end of the yard and put them on the tail track. Seventeen days after the accident, plaintiff confirmed the correctness of the conductor's recollection of what had passed between them, by signing a statement in which he says: "These engines had been giving me trouble all through the trip by running hot. They were to be set off at Conemaugh by my orders, to be overlooked and have packed."

After the conductor had received the yard master's orders, his train moved westwardly on No. 4 track, at from four to six miles an hour, for about three-quarters of a mile and stopped at the west end of Conemaugh yard. It was then 7:30 o'clock in the morning. Plaintiff says: "As soon as the engine stopped, down on the ground I got." He descended from the engine backward, the usual way, on the south side toward No. 3, the main line west-bound passenger track, and was almost immediately struck by No. 37, a passenger train running on time at from 40 to 45 miles an hour.

In answer to the question, if, when he got off the cab, he saw a train, or there was any train in view, he replied: "No, sir; well, I don't know whether there was any in my view or not; I didn't see any." He was then asked, "Did you look," and answered, "Well, I can't say that I did; because, if there had been a train I probably would have seen it; I don't know that I did look; I jumped right down and went under my

engine; I was going right ahead." Directly after the
accident he told the locomotive engineers on No. 37
that he neither saw nor heard the train, or the blasts
of the whistle. The statement of Ament, the engi-
neer on the leading locomotive, was that, "Just as
soon as he got down off the engine, he was right in
line with our engine and we struck him; I could not
tell what he was doing when he struck the ground,
because it was just in a flash." When No. 37 reached
a point opposite to the rear end of the freight train, the
fireman began to ring the bell, as the rule required, and
it was rung continuously; and as soon as the engineer
discovered plaintiff he gave the crossing whistle, fol-
lowed by the danger signal, and applied the emergency
brake.

If the negligence of the defendant be conceded, there
is no escape from the conclusion that the contributory
negligence of the plaintiff was such as to bar a recovery.
He was fifty-nine years of age, and for twenty years had
been in the service of the Southern and Chesapeake
and Ohio railway companies as freight and passenger
engineer. At the first stop on the mountain he got
off of his engine on the south side toward No. 3 track,
and was warned of the danger of alighting on that side
because of passenger trains over that track, both by
the engineer and brakeman. He knew that the Penn-
sylvania railroad at the point of accident was a four
track road, and that the last stop was in the yard of
one of the largest railway systems and busiest roads in
the United States. The space between these parallel
tracks (which from his experience must have been ap-
proximately known to him) was seven feet, five and
one-half inches, reduced, by the overhang of two feet
to a train, to three feet, five and one-half inches. Yet,
admittedly, he entered this place of obvious danger to

examine the dead engine without either looking or listening for approaching trains. The road at that point east was straight and afforded an unobstructed view of an approcahing train for 1.56 miles.

The fact that the engineer may have promised to stop the train in a safe place for him to inspect the dead engines did not relieve him from obligation to use ordinary care for his own safety. *Pendleton* v. *R. F. & P. R. Co.*, 104 Va. 813, 52 S. E. 574.

It is the settled doctrine of this court that when the negligence of the plaintiff proximately contributes to his injury there can be no recovery. *Southern Ry. Co.* v. *Bailey*, 110 Va. 833, 67 S. E. 365, 27 L. R. A. (N. S.) 379, and cases reviewed by Keith, P.

In the late case of *N. & W. Ry. Co.* v. *Strickler*, 118 Va. 153, 86 S. E. 824, it was held that there could be no recovery where the physical facts showed that if plaintiff had looked and listened he would necessarily have known of the approach of the auto motor truck; and, although he testified that he *did look* and *listen*, a recovery was denied. In the instant case the physical facts were present that existed in the *Strickler case*, and plaintiff's negligence was accentuated by his admission that he did not look and did not hear the approaching train.

The judgment must be reversed and the case remanded for a new trial, if plaintiff be so advised, to be had not in conflict with this opinion.

This conclusion renders it unnecessary to notice the remaining assignments.

*Reversed.*