## Wytheville.

### CHESAPEAKE AND OHIO RAILWAY COMPANY V. JONES.

June 14, 1917.

Absent, Burks, J.

1. CONTRIBUTORY NEGLIGENCE—*General Rule.*—Wherever the negligence of the plaintiff contributes proximately and efficiently to his injury, there can be no recovery.

2. CARRIERS OF PASSENGERS—*Contributory Negligence.*—Plaintiff accompanied, as care-taker, two new locomotives (dead engines) over the line of the defendant company. His fare as a passenger was paid, and he traveled in one of the engines, both of which were being hauled on their own wheels as parts of a through freight train. Plaintiff inquired of the conductor when and where the train would stop, so as to give him an opportunity to oil his engine. The conductor replied that. there would be frequent stops and plaintiff would have ample time to oil and inspect the engine. The train stopped for a moment on an automatic block signal. Plaintiff, without communicating with the train crew, within a minute after the train stopped, alighted from the cab of his engine and stood on the piston-rod, for the purpose of examining and oiling the engine..

  *Held:* That plaintiff was guilty of contributory negligence, which barred his recovery for injuries occasioned by the starting of the train while he stood upon the piston-rod.

Error to a judgment of the Hustings Court, Part II, of the city of Richmond, in an action of trespass on the case. Judgment for the plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*D. H. & Walter Leake* and *Henry Taylor, Jr.,* for the plaintiff in error.

*L. O. Wendenburg* and *T. Gray Haddon,* for the defendant in error.

Whittle, P., delivered the opinion of the court.

This is an action for personal injuries, in which the judgment under review was rendered in favor of L. J. Jones, the plaintiff, against the Chesapeake and Ohio Railway Company upon a demurrer to the evidence.

Several grounds of error are assigned, but inasmuch as we think the trial court erred in overruling the demurrer to the evidence, which necessitates a reversal of the judgment on the merits, we need only notice that assignment.

The plaintiff was an employee of the Richmond branch of the American Locomotive Works, and was ordered to accompany, as care-taker, two new locomotives (dead engines) over the line of the defendant company from Richmond, Virginia, to Cincinnati, Ohio, there to be delivered to the Big Four Railroad Company. His fare as a passenger was paid, and he traveled in one of the engines, both of which were being hauled on their own wheels as parts of a through freight train.

Before reaching Huntington, West Virginia, the engines were "running hot," and were withdrawn from the train and overhauled in the shops at that place. Afterwards, they were again taken up by another through freight train, consisting of fifty-one coal cars, their position in the train being "ten car lengths behind the engine" that was pulling the train; so that there were forty or forty-one coal cars between the "dead engines" and the caboose car in which the conductor was riding.

99

After necessary work had been done on these engines, on the evening of November 12, 1913, they were taken up by the freight train of the defendant above referred to. The plaintiff informed the conductor of his previous experience with the engines, and explained the necessity for maintaining a speed of not over fifteen miles an hour, and the urgency for extra precaution on plaintiff's part to keep the engines oiled to prevent a recurrence of the trouble. Plaintiff's relation of the happening of the accident was this: "I said (to the conductor) where will be the first place you stop? As I said that, the train pulled in two  *  *  And he laughed and said, 'Right here.' I said, 'I am not fooling about that now, because it is absolutely necessary; that engine has been hot; it has just been fixed; it has not been run since it was fixed, and it is absolutely necessary for me to examine it and oil it, and I would like to know when and where you are going to stop.' He said, 'We will be stopping all the way between here and Russell, taking off and putting on cars, and you will have ample time to inspect and oil your engine.' The first stop we made was on a trestle; on the right hand side right down in a hole; there was a double track and no bridge on the inside and I couldn't get out.  *  *  We moved off and went up to the next stop; I don't know how far, possibly two miles, or probably more or less, I don't know, and we stopped there. When I found they were going to stop, as usual I got out on the bottom step with the oil can in my hand and lantern on my arm, so I could put the oil on in the shortest possible time. I stood on the step waiting to see if he was going to stop for a water tank. I had no way of telling what he was going to stop for. After waiting a reasonable time, say, a minute or such a matter—They usually, if they pass a tank or don't go far enough  *  *  move up or move back. After finding he didn't do it, I took for granted that that was my opportunity, and I went to this box, particularly the one that had

been getting hot; I didn't have time or didn't attempt to go to any other. I smacked my hand on the outside and found it was warm. I was in the act of stepping up with the oil can to put oil on the inside on the swath and see the condition of the box. The minute I stepped on that rod, the time I got my weight up, before I could feel the box or anything, the train started and caught my foot. I tried to pull it out, but could not pull it out, just had to stand there in misery until the wheel made a whole revolution. After it got out I dropped to the ground. The grab irons on the side of the tank and engine were low enough to catch and I caught hold of that and crawled up into the cab. I had always kept my red lamp with me in the tank. I took the red lamp and waved it at that side and went to the other side and waved it out. If they saw it they did not heed it. I opened the angle cock underneath the engineer's valve and put the handle in emergency. Then the train came to a stop after it had run possibly half a mile * * * Some young men were alongside, and I asked some of them to phone for an ambulance. Some of them notified the train crew. Then the conductor came and said he was very sorry I was hurt. I told him that I was, too, and that I needed attention. He wanted to know could I go on to Russell. I told him no sir, my foot was in a dangerous condition and I would have to have attention immediately. He said some one had phoned for the ambulance. I notified him to set the engines off at Ashland." Plaintiff was then taken to the hospital, where the big toe was amputated.

The accident occurred in the night time, and the first intimation the conductor or engineer had of plaintiff's danger, or that he had been hurt, was after the train stopped at Ashland, fifteen miles from Huntington. They had no notification whatever from the plaintiff or from any other source that he had left the cab of his engine, or that he had any such purpose. The train stopped for a moment on

an automatic block signal. When another train is in the same block the signal automatically shows red, and under the rules of the company the train receiving the signal must wait one minute, and then move forward if it does not come white; and that was what was done in this instance. No other signal is given or allowed to be given except the block signal, which, as remarked, is automatic. The plaintiff's own evidence shows that he had no assurance of safety from the conductor in the circumstances narrated, nor was it possible for him to have protected the plaintiff from the consequences of his own imprudence. His version of the occurrence is, that he reached the conclusion from the character of the stop that it was not for the purpose of taking on water; and upon his own initiative he assumed the risk of examining and oiling the engine. Accordingly, within a minute after the train stopped, equipped with a lantern and oil can, he alighted from the cab of his engine and climbed up and stood on the piston-rod, which he must have known was fraught with unescapable danger if the train should move forward. Yet he says: "I took for granted that that was my opportunity * * *" Of his own volition, he left a place of safety and placed himself in a position of imminent peril, though he admits that he did not know what the train stopped for, or how long it was going to stay; and he took this hazard without apprising the train crew of his purpose, or, in any way, attempting to put himself in communication with them.

It seems clear to us that, taking the statement attributed by the plaintiff to the conductor, "that he would have ample time to inspect and oil his engine," at its face value, it was never contemplated that he would attempt to do so under the conditions disclosed by the record. By no reasonable rule of construction can the language imputed to the conductor admit of such interpretation. One may not thus

gamble with danger and visit the loss upon an innocent third party.

It is well settled in this jurisdiction that wherever the negligence of the plaintiff contributes proximately and efficiently to his injury, there can be no recovery. *Pennsylvania R. Co.* v. *Jenkins,* 119 Va. 186, 89 S. E. 96.

It follows from these considerations that the judgment of the hustings court must be reversed, the demurrer to the evidence sustained, and judgment rendered for the plaintiff in error, the Chesapeake and Ohio Railway Company.

*Reversed.*