## Richmond.

NORFOLK AND WESTERN RAILWAY COMPANY V. EVA
KELLEY, ADMX. OF BERNARD J. KELLEY.

January 16, 1930.

Absent, Chichester, J.

714

The opinion states the case.

*Kirkpatrick & Burks, W. Moncure Gravatt* and *F. M. Rivinus*, for the plaintiff in error.

*A. B. Hunt* and *T. W. Messick*, for the defendant in error.

EPES, J., delivered the opinion of the court.

This is an action brought by notice of motion for judgment by Mrs. Eva Kelley, administratrix of Bernard J. Kelley, deceased, against the Norfolk and Western Railway Company to recover damages for

the death of Bernard J. Kelley, which it is alleged was caused by the negligence of the railway company.

The Lynchburg and Durham Branch of the Norfolk and Western Railway Company crosses State Highway No. 18, formerly known as the Lynchburg-Campbell county turnpike, at a point near Bocock, about three miles from Lynchburg. At this point the railroad is in a cut approximately twenty-three feet deep, across which the highway is carried on a bridge.

About eleven A. M. on October 6, 1927, Bernard J. Kelley was traveling on this highway from Lynchburg towards Rustburg, driving a new two-passenger Oakland automobile; and while attempting to cross said overhead bridge his automobile crashed through the barrier or fence on the north (left) side of the bridge and fell to the tracks below. Kelley was pinned under the automobile and killed.

The specific negligence which the plaintiff alleges was the proximate cause of Kelley's death is that the company was not maintaining said bridge and the fences, barriers and guard ralls of said bridge in a reasonably safe condition for the protection of travelers thereon against the danger of running off the bridge and falling into the cut below, and more specifically that the timbers in said fence, barrier, and guard rails on the north side of the bridge were decayed and rotten.

The railway company plead not guilty and before the trial filed its grounds of defense which sufficiently give notice of the defenses upon which it in fact relied, including that of the contributory negligence of the plaintiff's intestate.

The jury found a verdict against the railway company for $5,000.00, which the company moved the court to set aside as contrary to the law and evidence, and to enter judgment for the defendant. The court

overruled the motion and entered judgment on the verdict for the plaintiff. The railway company assigns error.

The first assignment of error is the refusal of the court to give the following instruction asked by the railway company:

"The court instructs the jury that under the facts and circumstances of this case, the defendant was not guilty of negligence; that is to say it was not the duty of the defendant to maintain guard rails or barriers on said bridges of sufficient strength to withstand the impact of a fast moving automobile, and under these conditions you should find for the defendant."

Instead of this instruction the court, of its own motion, gave the following instruction, to which neither the railway company nor the defendant in error excepted:

"The court instructs the jury that it was not the duty of the defendant to maintain guard rails or barriers of sufficient strength to withstand the impact of a fast moving automobile, but it was its duty to maintain such a guard rail as that persons traveling over the bridge and using ordinary care might pass over the bridge in safety."

The instruction asked for by the railway company was in effect an instruction directing the jury to find a verdict for the defendant because as a matter of law the evidence shows no negligence on the part of the railway company. It not only instructs the jury that under the circumstances of this case it was not the duty of the defendant to maintain guard rails or barriers on said bridge of sufficient strength to withstand the impact of a fast moving automobile; but tells the jury that the barrier, fence or railing, and guard

rails on the north side of the bridge where Kelley's automobile crashed through were as a matter of law adequate.

While as the ordinary means and instrumentalities of travel change, railroads must keep in mind the new methods and instrumentalities of travel in the construction and maintenance of bridges carrying highways over their tracks, under ordinary conditions a railroad company is not charged with the duty of constructing and maintaining a fence, or railing and guard rail or other obstruction on such bridges which will insure that a fast moving automobile driven against the barrier will not crash over the guard rail along the floor surface and through the fence or railing and fall from the bridge. But the automobile is now the most common mode of travel on the highways, and it is the duty of the company to erect and maintain on such bridges fences, or railings, and guard rails along the floor or other obstructions which will enable a person driving an automobile and using the highway in the exercise of ordinary care to travel over such bridges safely. There is no hard and fast rule as to the kind, character and strength of the fence, or railings, or guard rails or other obstructions which must be erected and maintained; but they must be sufficient to protect a person driving an automobile on the highway at the point at which the bridge is located in the exercise of ordinary care against ordinary contingencies or those which may be reasonably apprehended. The requirement calls for more than a warning of the danger and a guide to the eye in keeping to the roadway; and the duty of the railroad company is not discharged by the erection and maintaining of a flimsy or rotten fence, or railing, presenting a visible warning and guide to the eye, and a guard rail along the floor of

insufficient height to deflect the wheels of an automobile which may come in contact with it when being driven over the bridge with ordinary care. *Comstock v. Great Northern Railway Co.*, 157 Minn. 345, 196 N. W. 177; *Hardin v. Southern Railway Co.*, 36 Ga. App. 427, 136 S. E. 802; *Bond v. Billerica*, 235 Mass. 119, 126 N. E. 281; *Kelsea v. Stratford*, 80 N. H. 148, 118 Atl. 9; *Medema v. Hines* (C. C. A.), 273 Fed. 52.

■ While the evidence on this point is conflicting, there is evidence in the record, exclusive of that which the court refused to exclude or strike out on the motion of the railway company, from which a jury might draw the inference that the timbers, or some of the timbers, in the fence or railing were rotten or unsound; that the guard rail along the floor (three and one-fourth inches high) was of insufficient height, and that the fence or railing and guard rails as then constructed and in their then condition did not provide a sufficient barrier along the edge of a bridge so located as was this one to enable persons traveling over the bridge in an automobile in the exercise of ordinary care to pass over the bridge in safety.

Under the testimony in this case the question of the negligence of the railway company was a question for the jury on proper instruction from the court.

■ But the railway company further contends that the instruction refused by the court should have been given, because the evidence plainly shows that the negligence of Kelley was either the sole proximate cause of his death or concurred with the negligence, if any, of the railroad company and proximately contributed to his death, and the court should have so instructed the jury as a proposition of law; citing *Etheridge v. Norfolk Southern Railway*, 143 Va. 789, 129 S. E. 680.

The railway company here confuses the question of its own negligence with the question of the contributory negligence of the plaintiff's intestate, as do some of the cases as to which citation is made by the railway company. The negligence of the railway company and the contributing negligence of the plaintiff's intestate may concur, but they remain two separate and distinct things; and the fact that the plaintiff's intestate may have been guilty of negligence which bars a recovery in no way affects the question of whether the railway company was negligent in the instant case.

The instruction asked did not purport to instruct the jury with reference to the negligence or the contributory negligence of the plaintiff's intestate, but upon the question of the negligence of the railway company. It is not appropriately worded to instruct the jury with reference to the negligence or the contributory negligence of plaintiff's intestate; and cannot be sustained on this theory. The court did not err in refusing to give the instruction asked.

The second and third assignments of error relate to the rulings of the court on questions relative to evidence introduced to establish the negligence of the railway company. The correctness of these rulings depend upon the particular state of the evidence in this cause, settle no principle of law or evidence, and are not controlling in the instant case. An intelligent discussion of them would unduly prolong this opinion to no useful purpose; and, as under the view which we take of this case the judgment of the court must be reversed and final judgment here entered for the railway company, it is not necessary to discuss them.

The fourth and fifth assignments of error raise the point which is decisive of this case. They assign as error the refusal of the court to set aside the verdict of

the jury as contrary to the law and evidence and enter up final judgment for the railway company, on the ground that the evidence both of the plaintiff and the defendant plainly shows that Kelley was guilty of negligence which, if not the sole cause of his death, at least concurred with the negligence of the railway company and was a proximate effective cause contributing to his death.

■ . This is not a case to which sections 3959 or 5792, Code of Virginia, providing for comparison and apportionment of negligence has any application. If Kelley's negligence was either the sole proximate cause of his death or concurring with the alleged negligence of the railway company, proximately contributed as an effective cause to his death, it is a complete bar to recovery in this case. *Norfolk & Western Railway Co. v. Ferguson*, 79 Va. 241; *Richmond Traction Co. v. Martin*, 102 Va. 209, 45 S. E. 886; *Chesapeake & O. Railroad Co. v. Jones*, 120 Va. 784, 92 S. E. 820; *Chesapeake & Ohio Railroad Co. v. Ghee's Adm'r*, 110 Va. 527, 66 S. E. 826; *Smith v. Norfolk and Western Railway Co.*, 107 Va. 725, 60 S. E. 56.

No witness who testified saw Kelley or his automobile from the time he was within 530 feet of the bridge until after they had fallen into the cut below the bridge; but Kelley's negligence plainly appears from the uncontradicted facts testified to by the witnesses both for the plaintiff and for the defendant.

The bridge is a wooden bridge, originally constructed in 1887. It lies east and west; is fifty-six feet long; and the roadway thereon is fourteen and one-half feet wide between the guard rails along the floor. It has no abutments. Kelley, coming from Lynchburg, approached the west end of the bridge and its north side was on his left.

On the north (left) side of the bridge, the barrier consisted of a fence, or railing, thirty-three inches high above the floor, and a guard rail three and one-fourth inches high and six inches wide nailed to the floor just inside the post supporting the railing. The posts supporting the railing were four by six inch timbers, forty-eight inches long, the lower twelve inches of which were fitted against the twelve inch stringer upon which the floor rested, and nailed thereto with large nails. The flooring, three inches thick, extended on each side beyond the post. On top of these posts was nailed a two by six-inch top rail, and on their interior faces were nailed two two by four-inch side rails, one at the top and the other sixteen inches below the top.

Counting from the west end of the bridge, Kelley's car crashed through the railing between the fourth and sixth posts, which are twenty feet, nine inches and thirty-six feet, nine inches, respectively, from the west end of the bridge. It broke the fifth post off short about even with the top of the stringer, leaving about twelve inches of it nailed fast to the stringer. It knocked the fourth post noticeably outward and loosened the nails in the sixth post, but neither broke nor entirely tore loose the fourth or sixth posts. The upper side rail between the fourth and sixth post was one sixteen-foot piece of timber which was broken. The top rail and the lower side rail each consisted of one piece reaching from the third to the fifth post, and one piece reaching from the fifth to the seventh post. The top rail was broken between the fifth and seventh post and the lower side rail between the fourth and fifth posts. The three and one-fourth inch guard rail was not broken or torn loose from the floor. The fourth post was chipped off on one corner; and one of the plaintiff's witnesses testifies that the marks along the north

railing showed that Kelley's automobile had scraped along the railing for some distance (he says two-thirds the length of the bridge) before it crashed through. When the bridge was repaired the afternoon of the accident the fourth and sixth posts, the top rail reaching from the third to the fifth posts, and the lower side rail reaching from the fifth to the seventh post were nailed back in place. The uncontradicted evidence of the carpenter who repaired the bridge is that the twelve inch stub of post No. 5 which was left on the stringer was sound, and that posts No. 4 and No. 6 which were nailed back were sound and not doty or decayed. Some of the witnesses, however, referring to the north railing as a whole, testify that it was in a bad condition, and that the timbers knocked off into the cut looked like they were doty (*i. e.* decayed).

When Kelley's automobile was found it was lying diagonally across the east rail of the track just below the north edge of the bridge, top down, wheels upward, and its head pointed towards the east bank of the cut. The center of the track, between the rails, is directly below the post No. 5 which was broken off. None of the tires were bursted; the front end of the car was not smashed up; nor was the rear end, except the bumper, mashed up. No witness testifies as to the condition of the left side of the car.

At a culvert under the highway 1,597 feet from the bridge, Kelley passed Herman and Jack Coles who were driving a Ford truck and going in the same direction as Kelley. The uncontradicted testimony of both the Coles boys is that they were driving between fifteen and twenty miles an hour, and that they maintained the same speed from the point at which Kelley passed them until they reached the bridge. When the Coles boys had reached a point 1,103 feet from the bridge,

Kelley went out of their sight when he was at a point approximately 530 feet from the bridge. All measurements along the highway herein given are from the west end of the bridge.

From the culvert at which Kelley passed the Coles boys to the birdge is up-grade, and for about 600 feet from the bridge the grade is approximately a seven per cent grade.

Both the Coles boys testify that when Kelley passed them and afterwards as long as he was in their field of vision, he was running between thirty-five and forty miles an hour; and Jack Coles says that Kelley was increasing his speed "a little bit going up hill."' This estimate of Kelley's speed while in the field of vision of the Coles boys is borne out by the fact that while the Coles boys traveled approximately 500 feet, Kelley traveled approximately 1,100 feet. If the Coles boys were traveling at fifteen miles per hour this would put Kelley's speed at approximately thirty-three miles an hour; and if the Coles boys were traveling twenty miles an hour, Kelley's speed would have been approximately forty-four miles per hour.

From the point at which Kelley went out of sight of the Coles boys (530 feet from the bridge) the road runs straight for 200 feet to a point 330 feet from the bridge; and at a point 432 feet from the bridge is a highway sign showing curve ahead.

At a point 330 feet from the bridge the road begins to curve to the left. For from 180 to 185 feet the curve is an easy curve to the left, but at about 145 feet from the bridge the curvature to the left becomes very sharp, and within the next ninety to ninety-five feet the center line of the road turns through an angle of more than ninety degrees. The roadbed on the outside of

this sharp part of the curve is elevated above the inside surface. No part of the curve is on the railway's right of way.

At fifty-two feet from the bridge the road straightens out, and continues in a straight line across the bridge and for about 250 feet beyond it.

The width of the macadam roadway for several hundred feet on each side of the bridge is approximately thirteen feet, and the highway between the ditches or drains, including the shoulders, is approximately twenty-eight feet.

The testimony of plaintiff's own witnesses, who were accustomed to driving automobiles and were thoroughly familiar with this curve and bridge, is to the effect that it would be reckless to try to drive a car around that curve and onto that bridge at more than about twenty-five miles an hour. R. L. Childress, a county officer whose duties require him to travel the roads on a motor cycle and by automobile, upon whose testimony the plaintiff places special reliance, when asked upon direct examination if a man could make that curve and enter the bridge at forty-five miles an hour, says: "No, sir." When asked if he could do it at thirty-five miles an hour, he says: "He would have to slide considerable." When asked could he do it at thirty miles an hour, he says: "Yes, by using your brakes if you want to take a chance, you could do it at thirty, I reckon." Upon cross examination, he says: "If he didn't meet anything there, and if he had his car under control, and at the speed limit for a curve, twenty-five miles an hour, he could have made it."

Dewitt Johns and Hugh Mitchell were the first persons to get to the scene of the accident. They were cutting corn in a barn to the right of the bridge and about 600 feet from it, when they heard the crash of

the car and saw dust rising from the cut into which the car had fallen. They went at once to the bridge. Johns says: "We walked over to the bridge." Mitchell says: "I ran down there."

When the Coles boys, keeping their pace of between fifteen and twenty miles an hour, got to the bridge Dewitt Johns and Hugh Mitchell were already there. Herman Coles says that when he drove up one of them "was on the bridge and the other one was down the road a little piece."

J. E. Sinclair, a driver for Texas Oil Company, was the next person to arrive. He phoned to Lynchburg to the police department for aid; and soon after the accident R. H. Johnson and R. W. Childress of the Lynchburg police department arrived.

Herman Coles, Sinclair, R. W. Childress, and Hugh Mitchell, called as witnesses for the defendant, all testify that they could see the tracks made by Kelley's automobile as he approached the bridge and ran onto it; and that these tracks were on the outside of the macadamized portion of the roadway. Sinclair says: "The automobile tracks were possibly three or four feet from the hard surface where it skidded around and came back onto the bridge. It started right on the bend of the curve and was nearly over in the ditch and the wheels skidded around to where it went over the bridge."

R. W. Childress testifies that soon after he got to the bridge he looked for the tracks of the automobile and could trace them plainly; that the tracks of the automobile came around from the curve off the macadam on the dirt, and were at one place at least two and one-half feet off the macadam, and then gradually came back and just missed the right hand railing of the bridge by from six to eight inches, "and ran right across

the bridge"; that "you could see the tracks where it went across the bridge," but that he could not say just where the car hit the railing; that "you could see where he cut his car and just did miss this right hand rail"; and that he looked with particular attention to see if the tracks showed any skidding of the car and that they did not.

Herman Coles testifies that he saw the tracks of the automobile; that they were on the outside of the macadam; and that he showed them to Mr. Haller, the special investigator of the railroad company. Hugh Mitchell, who testifies that the morning following the accident he went with Mr. Haller to the bridge and showed him the tracks, says that the tracks were about four feet off the macadam on the right hand side of the road and came back to about one foot from the right hand railing as they went on the bridge, and led from that point into the middle of the bridge where the automobile went through, but that he could not trace the track and tell where the car went off the bridge; that there was dust on the tracks and the tracks look like the tread of the tires on the car, but that he did not go down into the cut and examine the car.

R. L. Childress, a witness for the plaintiff, on direct examination when asked whether he could see the car tracks made by Mr. Kelley's car, replies: "I could see the car tracks, but I wouldn't say it was his tracks, where it ran along the side and ran about two thirds of the bridge and stopped right against one post that came out underneath there, it hung up against that."

On the morning following the accident Mr. Haller had photographs taken of the road and the bridge from west of the bridge showing the tracks which were pointed out to him by Hugh Mitchell. One of these photographs shows the tracks made by the wheels on

both sides of a car, and that the car which made them came around the east end of the curve with the left wheel well to the right of the macadam, and for some feet well to the right of the shoulder of the macadam; that as the car rounded the curve the tracks of the rear wheels were not tracking the tracks of the front wheels, but were making tracks separated by some inches from those of the front wheels; that within fifty feet of the bridge the car was first circled back towards the macadam on a short radius to the left, and that then a short distance from the bridge, just as the left front wheel reached the right edge of the shoulder of the macadam, the wheels were cut sharply to the left and their tracks go off in nearly straight lines which if prolonged would cut across the bridge from the right to the left side, striking the left side about twenty feet, or less, from the end of the bridge. The photographs show no track marks on the macadam surface or on the bridge.

When Kelley was about 530 feet from the bridge he was driving at from thirty-five to forty miles an hour and increasing rather than diminishing his speed. At 434 feet from the bridge there was a sign warning him that there was a curve ahead. At the rate of speed the Coles boys were driving it took them only from thirty-eight to fifty seconds to drive the 1,103 feet from the point at which they were when they last saw Kelley to the bridge. During this interval of time, Kelley had driven approximately 550 feet and plunged off the bridge; the crash of his car and the dust raised by it when it fell into the cut had been heard and seen by Johns and Mitchell; and they had left their work and come 600 feet to the bridge before the Coles boys arrived. The course pursued by Kelley's automobile as marked by its tracks shows conclusively that he did

not have his automobile under control as he approached the bridge and ran onto it. He just missed the right hand rail with his right wheel, passed across the bridge to the left side at a sharp angle, striking the left side within twenty feet of the end of the bridge, dragged along the left railing a short distance, and still had sufficient momentum as he went through the railing to break in two at least one four by six-inch timber, post No. 5, which the testimony shows was sound at the place at which it was broken off.

The uncontradicted facts, testified to by the witnesses both for the plaintiff and the defendant, we think permit of but one conclusion, that Kelley negligently undertook to come around the curve and onto the bridge at an excessive and reckless rate of speed; lost control of his automobile in so doing, and by reason of his excessive and reckless rate of speed was unable to hold it to the roadway as he approached and to steer it onto and across the bridge; and that such negligence and recklessness proximately contributed as an effective cause to his death, and bars any recovery by his administratrix.

It appears from the evidence that the verdict of the jury and the judgment of the court are plainly wrong. The judgment must be reversed, the verdict of the jury set aside, and final judgment will be here entered for the plaintiff in error.

*Reversed.*