13311

TENNENT v. SOUTHERN RAILWAY COMPANY ET AL.

(161 S. E., 860)

*Messrs. John M. Daniel, Attorney General,* and *Cordie Page* and *J. Ivey Humphrey, Assistants Attorney General,* for appellant State Highway Department,

*Messrs. H. E. DePass* and *F. G. Tompkins,* for Southern Railway Company, appellant,

*Messrs. Perrin & Tinsley* and *Bomar & Osborne* and *Butler & Hall,* for respondent.

December 29, 1931.

The opinion of the Court was delivered by MR. JUSTICE COTHRAN.

These two cases arose out of the same accident and were tried together on Circuit and in this Court. An automobile driven by E. S. Tennent, Jr., son of E. S. Tennent, Sr., who owned it, went into a railroad cut, under circumstances

which will be detailed, causing damage to the car, and personal injury to the driver. The owner brought suit on account of the damage to the car and the driver, on account of the injury he sustained.

The cases were tried before his Honor, Judge Johnson, and a jury, the trial resulting in a verdict in favor of the son for $1,750.00, and a verdict in favor of the defendants in the case of the father. The father made a motion for a new trial in his case which was granted, and the defendants, in the case of the son, which was refused. The defendants have appealed from the order granting a new trial in the case of the father, and from the judgment entered upon the verdict in the case of the son.

The facts appear to be as follows:

About three miles southeast of Blacksburg, on the railroad which runs from that point by York, Rock Hill, Lancaster, and other points, there was a cut of considerable depth and length; it was spanned by a bridge, a part of the state highway which runs practically parallel with the railroad; in approaching this bridge, the highway made quite an abrupt turn to the right, some 40 feet from the bridge; it appeared expedient to the state highway commission, in making quite a change in the highway, not to follow the old road from the point of the abrupt turn, but to cross it and follow practically a straight line to the railroad cut, some 30 feet or more south of the location of the old bridge. The Railroad Commission on July 18, 1923, passed an order requiring the railway company to construct a new bridge at the new point at which the changed highway reached the railroad cut, and that the cost be apportioned share and share alike, between the railroad company and Cherokee County.

Litigation then ensued between the railroad company and the Railroad Commission; the railroad company contending that the order was a confiscation of its property. This litigation was settled by a consent order signed by his Honor, Judge Memminger, on November 20, 1924, directing the

railroad company, upon the payment to 'it of $1,500.00 by Cherokee County, to construct the bridge, commencing at once and proceeding with reasonable dispatch.

It appears that in the meantime, that is, between the order of Judge Memminger and the construction of the bridge by the railroad company, the State Highway Commission had proceeded with the extension of the relocated highway from the abrupt curve to the right of the old highway up to the railroad cut about 40 feet, and on the other side of the cut towards Blacksburg, and had erected barriers at the points of divergence on both sides of the railroad cut; detour notices were erected by the highway commission on both sides. Pending the construction of the new bridge, the traveling public continued to use the old bridge with its approaches on both sides.

It appears that on April 19, 1925, E. S. Tennent, Jr., driving his father's car, left Spartanburg in the afternoon (Sunday) with certain companions, a lady and two gentlemen. Passing through Thickety between Spartanburg and Blacksburg, they were arrested for speeding at the rate of 50 miles per hour. Tennent paid a fine of $10.00, and warned the officers to watch out for him coming back that night. The party returned from Rock Hill about 10:20 that night. At York, the party of joy riders had a round with a policeman by suddenly backing the car towards him at about 40 miles an hour. Before reaching York, at Rock Hill, they pulled up certain parking signs; they left York in a roar at 50 or 60 miles an hour with Policeman Boyd chasing them in a Ford car, unable to overtake them. At Bethesda Cemetery, between York and the scene of the accident, they picked up a tombstone which had been erected at the grave of W. N. Neal the year before. About a mile from the scene of the accident, C. W. Wannamaker came upon the party just getting into the car after repairing a tire. Three-quarters of a mile from the bridge the party sped past Wannamaker going about 60 miles per hour. When they reached the

abrupt curve in the road leading to the old bridge, Tennent, who was familiar with the location, realized that he could not go straight on but had to turn into the old road. In an effort to make the turn at the sharp righthand curve 40 feet from the old bridge, he applied the brakes and cut his car so sharply to the right that his wheel skidded, carrying his car straight away along the new extension, which the highway department had built and was maintaining, over the barriers and into the cut at the point where the new bridge was subsequently erected. The crash from the impact awoke a lady, Mrs. Camp, who was in her home nearby.

It appears to have been the young man's habit to drive at a high, reckless, and unlawful rate of speed; he held the record for violations of the speed laws in his home town. Just ten days before the accident he was fined $10.00 for speeding 50 miles an hour on Main Street in Spartanburg. Two months after the accident he was arrested and fined for speeding. On King Street in the City of Charleston, prior to the accident, he turned a right-hand corner, applied his brakes, cutting his wheels to the right and skidding.

The evidence is not controverted by the young man, and from it we do not see how any other reasonable inference can be drawn than that the catastrophe was the result of his reckless conduct; there is not recorded in the book of time, a wilder ride.

It appears that the relocation of the highway was made some months before the bridge was constructed. The relocation was under the exclusive maintenance of the highway commission which had directed the placing of barriers on both sides of the cut; the one on the York side being about five feet from the abrupt curve. It does not appear therefore that that portion of the extension between the abrupt curve and the edge of the cut had ever come under the control of the railroad company, or that it was in anywise responsible for its maintenance. As a matter of fact, it appears that the edge of the cut was just within the right of way of the rail-

road company; it having at that point a right of way of only 30 feet from the center of the track, and that it was 60 feet from the edge of the cut on one side to the edge of the cut on the other.

Judging by the allegations of the complaint, it seems that the counsel for the plaintiffs are confused in the place of the accident, apparently apprehending that it occurred at the end of the old bridge, by reason of insufficient guardwings, as will appear by a reading of the complaint set forth in the reply brief of the appellants, which is too voluminous to be repeated here; the same confusion appears in the testimony of the plaintiff's witness Bourne.

The young man admitted that he was driving 30 or 35 miles an hour approaching the abrupt curve. The evidence shows that at the time of the accident plaintiff approached the sharp curve going toward the bridge at a speed in excess of that allowed by statute, and at such a great speed that he could not make the turn, and negligently cut his car to the right, applying his brakes so sharply that the automobile skidded, in which acts he negligently contributed as a proximate cause to his injuries and damages to the automobile.

Section 582 of the Criminal Code of South Carolina of 1922 is as follows: "*Duty of Person Operating Motor Vehicle.*—Upon approaching a crossing of intersecting public highways, or a bridge, or a sharp curve, or a steep descent, and also in traversing such crossing, bridge, curve or descent, a person operating a motor vehicle shall have it under control, and operate it at the rate of speed no greater than six miles an hour, and in no event greater than is reasonable and proper, having regard to the traffic then on such highway and the safety of the public."

This statute was charged by the presiding Judge as the law applicable to a case of this kind, and is sustained by *Thomas v. S. A. L. R. Co.,* 157 S. C., 144, 154 S. E., 97. In the *Thomas case,* the nonsuit was sustained upon the ground upon which it was based by the Circuit Judge; the

violation of the speed statute under similar circumstances, approaching a bridge crossing.

C. W. Wannamaker, engineer of the State Highway Department and of the Cherokee County Highway Commission, testified: That he had a barricade of good substantial timber erected across this new extension prior to the accident; that he was on this road working with his force Saturday, April 18th, and the barricade was in place at that time; that this barricade was standing across this new extension between fifteen and twenty feet from the cut; that on Sunday night he went down this road toward Hopewell Church; that the barricade was in place; and that on his returning right behind the plaintiff he found that they had knocked the barricade down and dragged it down with the log into the cut, where it was entangled with the wheels of the car. Also the plaintiff E. S. Tennent, Jr., testified that when he was one hundred feet away he saw two posts immediately across the road holding the log up above the ground from two to five feet.

Conceding that this barricade had been knocked down and that there was none there this Sunday night, it is clear that the proximate cause of the injury and damage to the plaintiffs was as stated by the plaintiff and by his witness, Wiley Bourne, to the effect that he was driving his car at an excessive rate of speed, to wit, at a rate of speed in excess of that allowed by statute, and that when he saw this log he could not make the turn, but in his effort to do so, he slapped on his brakes too sharply, causing the wheels to lock and the car to skid away into the cut.

The case of *Eberhart v. R. Co.,* 34 Ga. App., 49, 129 S. E., 2, 4, is instructive; the driver of an automobile, one Dr. Proctor, approached an overhead highway bridge traveling between twenty and twenty-five miles an hour, and, being unable to make the turn, struck the left side of the bridge, crashing through the guard rail and precipitating him into the cut. The Court said:

"The controlling issue in this case is, What was the proximate cause of the alleged injury as shown by the amended petition? After a careful study of the record and of numerous decisions, we are convinced that the real, direct, proximate cause of the alleged injury was the operation of the automobile by Dr. Proctor, and that the Court properly sustained the general demurrer to the petition. Assuming the allegations of the petition to be true, for the purpose of testing it as against a general demurrer, these alleged negligent acts of the defendant company were not the proximate cause of the alleged injury. While the mission upon which he was going may have, from a moral standpoint, justified Dr. Proctor in traveling at the rate of 20 to 25 miles an hour on a bridge, on a dark and rainy night, and the darkness and the rain may have caused him to misjudge the roadway, still these are circumstances over which the defendant company had no control, and the fact remains that, if Dr. Proctor had driven at a proper rate of speed and properly steered the automobile in approaching and driving upon the bridge, he would have gone across in safety, regardless of the alleged defective guard rails or the advertising signs, and the accident would have been avoided, and his failure to do so was the real, direct, and proximate cause of plaintiff's injury.

" 'The "proximate cause" of an injury is that cause which immediately precedes and directly produces the injury, without which the injury would not have happened. * * * "So long and so far as an ultimate result can be traced to a first cause, though through successive stages, the responsibility rests with the one who put in operation the chain of events which caused the wrong or injury." * * * The proximate cause is the dominant cause, not the one which is incidental to that cause, its mere instrument, though the latter may be nearest in place and time to the loss. * * * The proximate cause of an accident is a cause without which the accident would not have occurred. * * * The

proximate cause is the efficient cause, the one that necessarily sets the other causes in operation.' "

From a consideration of all of this evidence, it plainly shows that E. S. Tennent, Jr., was guilty of negligence which, if not the sole cause of his injuries and damage to his father's automobile, at least concurred with any negligence imputable to the defendants, and was a proximate efficient cause contributing to the plaintiffs' injury and damage. *Norfolk & W. Ry. Co. v. Kelley,* 153 Va., 713, 151 S. E., 121.

The defendant railroad company made a motion for a nonsuit, and, upon its refusal, a motion which also was refused, for a directed verdict in its favor, upon the ground that there was no evidence tending to establish negligence upon its part. We think that the presiding Judge should have granted the latter motion; certainly the former, for the following reasons:

The liability of the railroad company, under the circumstances, could be sustained only upon the theory that it maintained a deep cut, which bisected a public highway, along which persons were entitled, or were accustomed under a license, to pass, without providing sufficient protection to them against falling into the cut. It must have appeared: (1) That the railroad company was charged with the duty of such protection; (2) that the person injured by falling into the cut was entitled by right or license to the use of the highway up to the cut; (3) that he was unaware of the presence and danger of the unprotected cut.

Not one of these essential elements is shown to have existed in the present case. The extension had been constructed by the highway commission; it had not been completed; the commission had entire possession and control of it; it demonstrated its possession and control by placing substantial barriers upon both sides of the cut, awaiting the construction of the bridge; the railroad company had assumed and was bound to exercise no duty in connection with it; in fact,

the extension was entirely outside of the railroad company's right of way. If it should be urged that the railroad company had unreasonably delayed obedience to the order of Judge Memminger, there is no evidence tending to show that the delay was an act of negligence on the part of the railroad company; and, if there had been, the delay could not possibly have been the proximate cause of the catastrophe.

There was no evidence tending to show that the young man had the right or a license from the railroad company or any one to use the extension; there was every indication that the extension had not been opened for travel; notices were put up and barricades constructed.

So far from showing that the young man was unaware of the extension and the cut, he had only a few hours before approached the locus from the Blacksburg side, and, stopped by the barricade on that side, had detoured and crossed the old bridge.

The subject is greatly illuminated by the case of *Matthews v. Seaboard Air Line Ry.*, 67 S. C., 499, 46 S. E., 335, 338, 65 L. R. A., 286. That was an action for damages on account of the alleged wrongful death of one Partlow who was walking along between the tracks of the Southern Railway Company and the Charleston & Western Carolina Railroad Company in the City of Greenwood a short distance north or west of the station. After the construction of these two railroads, the Seaboard Air Line was constructed through the City of Greenwood. The tracks of the last-named company were laid in a cut under the tracks of the other two railroads mentioned. The public generally was accustomed to use the tracks of these overhead railroads in going toward the business section of the city, and had been so using them for a long period of time sufficient to establish a license. The deceased Partlow walking down between the tracks of these two railroads, at night, a stranger in the city, and unaware of the existence of the cut against which neither of the railroads in question had erected any barriers, fell into the

cut and was killed. His administrator brought an action against all three of the railroads and the City of Greenwood. The railroad companies demurred to the complaint and were overruled; the demurrer of the city was sustained, and it passed out of the case. Upon appeal to the Supreme Court, the order of the Circuit Judge overruling the demurrers of the three railroad companies was sustained upon the ground that, although the cut had been constructed by the Seaboard Air Line, the other two railroads were cognizant of that cut and of the danger to the public who were practically licensed to use the other tracks as a walkway, and should have taken precautions against injury to persons exercising that license, and unaware of the existence and danger of the cut. It will be observed that the alleged cause of action was sustained upon the ground of license to the public and the fact that Partlow was unaware of the existence and danger of the cut. The Court said: "But where a railroad company allows the public to use its right of way for a long time at a particular place in a large town so continuously and frequently that it becomes a well-beaten or clearly defined path, plain and open, a reasonable man may well infer that he will not encounter unguarded cuts and the other dangers of the ordinary path along the track. In such a case the owner of the property knows and acquiesces in the use, and by his acquiescence those wishing to go in that direction are lured into a sense of safety in following the course obviously taken by those who have preceded them. If the owners, or those in control of the property, fail to observe ordinary care in avoiding injury to persons who travel the path, relying on the safety suggested by the implied invitation, they must be held responsible. * * * The general rule, in which all the Courts agree, however, is that the owner of property is held to ordinary care to avoid injury to one who enters his premises by invitation, express or implied; but the variance is as to what facts imply an invitation. * * * It is, of course, always a question for the jury to determine

whether the way was so plain and so constantly used, with the acquiescence and consent of the owner, as to imply an invitation to the public to enter. * * * Those who walked in the path here described entered not a public highway, but the property of the railroad companies as licensees; and, even if they did so in pursuance of an invitation, express or implied, but knew of the existence of the cut and its dangerous condition, they accepted the invitation in full view of the danger, and for their own convenience voluntarily assumed it. In such case, it seems clear the railroad companies would not be responsible for resulting injuries. But, if the jury should find the path is of the kind to invite entrance and suggest safety, one who enters, relying upon this invitation, in ignorance of danger, and falls into a deep unguarded cut, at right angles to the path, may hold the railroad companies responsible, in the absence of contributory negligence, if they had reason to expect such persons to enter."

In the case of *Dorn v. Ry. Co.*, 58 S. C., 364, 36 S. E., 654, 655, a small boy had fallen into the same cut described in the *Matthews case* just cited. The Court on appeal sustained an order of Chief Justice Watts, then Circuit Judge, sustaining a demurrer to the complaint, saying: "The complaint was defective in not stating facts from which it could be inferred that it was the duty of the defendant to properly safeguard the excavation on its premises. * * * In order to show that defendant owed plaintiff any duty to safeguard its excavation, it was essential for plaintiff to allege by what right he was on said premises where he was injured, so as to create a corresponding duty in defendant to use reasonable precautions to protect him from danger."

Assuming even that it was a joint duty imposed upon the railroad company and the State Highway Commission to guard the cut that travelers might not drive into it, the evidence is abundant and uncontradicted that the highway commission had erected substantial barriers upon both sides

of the cut; the barrier on the Blacksburg side necessarily having been observed by the young man on his outward journey. The railroad company had the right to assume that, as the extension had not been opened for travel, and passage over it effectually barred, no one would attempt to use it. As has frequently been stated by this Court: "Precaution becomes a duty only when there is reasonable cause to apprehend danger." The testimony of one witness for the plaintiff was to the effect that the barriers placed in the extension by the highway commission had been broken down by some automobile negro drivers on Saturday night before the Sunday night when the young man and his party went into the cut, of which neither the railroad company nor the commission had notice in time to replace it. The evidence shows that this breaking down of the barrier occurred at the old bridge, and not on the extension at all.

A matter that does not appear to have been noticed is this: A railroad cut is always through a hill; the apex of the hill is generally approached upon an upgrade. It would seem then that both roads from the abrupt turn to the old bridge and to the cut along the extension must have been uphill. The Court is not obliged to accept the impossible explanation of the young man that as he turned sharply to the right his wheels locked and the car skidded, on dry ground, uphill, a distance of at least 30 feet, broke down the barrier, and slid into the cut.

For these reasons, we think that the motion of the railroad company for a directed verdict should have been granted; at the least that the motion for a nonsuit should have been.

In reference to the case of the senior Tennent, the father, against the railroad companies and the State Highway Commission, which resulted in a verdict in favor of the defendants, which the presiding Judge set aside and granted a new trial by an order from which all of the defendants have appealed, a very unusual situation is presented.

Considering first the appeal of the Highway Commission from the order granting a new trial. The plaintiff's action was for damage done to his automobile, a total loss, which he estimated as being worth to him from $1,000.00 to $1,200.00, insured for $800.00.

In the order granting a new trial, the presiding Judge said: "During the progress of the case, it developed that the plaintiff had carried an indemnity policy on the automobile in question and had been reimbursed thereunder, to the amount of Eight Hundred ($800.00) Dollars. Thereupon plaintiff's attorneys moved that leave be granted to appropriately amend the Summons and Complaint in the title thereof so as to read: 'E. S. Tennent individually and as Trustee of an Express Trust, Plaintiff,' and by making appropriate allegations in the body of the Complaint to the effect that the plaintiff carried an insurance indemnity policy in the United States Casualty Company covering said automobile and after the destruction thereof was reimbursed therefor to the extent of Eight Hundred ($800.00) Dollars and that to the extent of said amount, with accrued interest thereon the said United States Casualty Company was subrogated to the rights of the said E. S. Tennent and the said E. S. Tennent executed a subrogation agreement to the said United States Casualty Company under which it was agreed that the said suit might be maintained in behalf of the said Casualty Company either in its own name or in the name of the said plaintiff and further alleging that the plaintiff was damaged in a greater amount than the amount of said insurance and for such purpose brought the action in his own interest. It was further requested that leave be given to amend the prayer of the Complaint so as to pray for judgment in favor of the plaintiff as trustee for the United States Casualty Company for the sum of Eight Hundred ($800.00) Dollars and interest thereon from the date of the subrogation receipt and for judgment in favor of the plaintiff, individually, for

the excess thereof up to the total amount sued for in the Complaint, actual and punitive damages."

The plaintiff in that action is shown by the evidence to have had an interest in the recovery of damages to the extent of the difference between the value of the car, $1,000.00 to $1,200.00, and the amount of his reimbursement by the insurance company, $800.00, which would be $200.00 to $400-.00, if the allegations of his complaint had been sustained, and the insurance company, if entitled to recover at all would be entitled to $800.00, the amount paid by it to Tennent, Sr.

The motion of the defendant Highway Commission for a nonsuit was made upon the same grounds as were urged by the railroad company. (We speak of them as one, though there were two joined as defendants; practically the Southern Railway Company.) In addition, the Highway Commission presented the ground that "it appears from Exhibit 'P,' that E. S. Tennent had transferred and assigned and set over to the United States Casualty Company, all claims, demands, and causes of action which he had against any person, firm, or corporation, to recover for damages complained of in the complaint." (It does not appear that this defendant made a motion for a directed verdict.)

Unless the highway commission can sustain its motion for a nonsuit upon the grounds upon which the motion of the railroad company was made, we do not think that this additional ground can be sustained, for the reason that the subrogation assignment of this plaintiff to the insurance company was not an assignment of his entire interest in the damages to be recovered, but only to the extent of the amount of insurance which the insurance company had to pay to him, leaving the plaintiff the right to recover all over and above that amount, if the allegations of his complaint as to the negligence of the defendants, any or all, should be sustained. Under these circumstances, we do not think that the nonsuit could properly have been granted.

The embarrassing fact that confronts us in the appeal of the highway commission from the order granting a new trial in the case of Tennent, Sr., is that its exceptions do not present the contention made by the railroad company upon its motion for a nonsuit and a·directed verdict,·that there is no evidence tending to show negligence on the part of the defendant, and that the evidence shows that the catastrophe was due solely to the negligence of the plaintiff's son and agent, the driver of the car. For these reasons, we think that the appeal of the highway commission from the order granting a new trial in the case of Tennent, Sr., must. be disregarded.

However embarrassing the position of the commission may be as to the order granting a new trial in the Tennent, Sr., case, it has fully protected its appeal from the judgment in favor of Tennent, Jr., as the exceptions show :

"Exception 1. It is respectfully submitted that his Honor, the presiding Judge, erred in not granting a nonsuit in favor of this appellant for the reason that the evidence shows that the plaintiff's injury was due to his own negligence, in driving around a sharp curve at an excessive rate of speed, in violation of a criminal statute, and that said excessive speed was the proximate cause thereof.

"Exception 2. It is respectfully submitted that his Honor, the presiding Judge, erred in refusing to grant a nonsuit in behalf of this appellant for the reason that the testimony of plaintiff himself shows that he saw the barricade across the road at a sufficient distance to have brought his.car to a complete stop, even though it was being driven at a rapid and unlawful rate of speed, and his failure to bring his car to a stop in the face of such warning and dangerous condition existing ahead constituted such negligence on his part as to be the sole and proximate cause of his injury."

For the reasons above stated, its motion should have been granted; it would be useless ceremony to remand the case for a new trial in the Tennent, Sr., case burdened by an

adjudication that Tennent, Jr., in whose shoes Tennent, Sr., must stand, has no case.

The appeal of the railroad company from the order granting a new trial in the Tennent, Sr., case is not embarrassed by the difficulties which confront the commission; its exceptions fully cover the point:

"1. Because the Presiding Judge erred in not granting a nonsuit and in granting the motion of respondent, E. S. Tennent, Sr., for a new trial as to these defendants;—the error being that the testimony showed that the damage to his automobile was directly due to and proximately caused by the negligence *per se* of E. S. Tennent, Jr., in approaching the sharp curve some forty feet east of the overhead bridge at such an unlawful rate of speed that he could not control same, and by suddenly applying the brakes and cutting the car so sharply to the right at the apex of said curve as to cause same to skid away down the new extension, erected and maintained by the State Highway Department, and into the cut.

"2. Because the Presiding Judge erred in not granting a directed verdict and in granting the motion of respondent, E. S. Tennent, Sr., for a new trial as to these defendants when the testimony showed that whatever damage came to his automobile was the result of the same skidding across the new extension of the highway some forty feet away from the defendants' bridge and at least twenty-four feet south of these defendants' guard rail on a highway constructed and maintained by the State Highway Department, over which these defendants have no control, and for the condition of which they were not responsible."
—matters which have been sufficiently covered in what precedes.

The defendants preferred two requests to charge, numbered 4 and 5, which embodied substantially the proposition that, while the defendants may have been required to erect notices and barriers to protect travelers on the highway

from going into the cut, it was not their duty to provide a barrier that would resist the weight of an automobile precipitated against it under extraordinary circumstances. The presiding Judge at first gave the instruction requested, but later recalled the jury and instructed them that that was not the law. In this we think that he was in error; the proposition requested is sound law and is in nowise a charge upon the facts.

In *Norfolk & W. Ry. Co. v. Kelley,* 153 Va., 713, 151 S. E., 121, 122, the plaintiff, while driving at an excessive rate of speed on rounding a curve, crashed through the guard rails of an overhead bridge just beyond the curve. The charge of the Court was as follows: "The Court instructs the jury that it was not the duty of the defendant to maintain guard rails or barriers of sufficient strength to withstand the impact of a fast moving automobile, but it was its duty to maintain such a guard rail as that persons traveling over the bridge and using ordinary care might pass over the bridge in safety."

This charge was sustained by the Court of Appeals.

In *Medema v. Hines* (C. C. A.), 273 F., 52, 54, the plaintiff was injured when he lost control of his car which skidded as he approached an overhead bridge, crashing through the guard rails and being precipitated to the track below. Upon the appeal, the Court said: "As to the railing on the approach, *McClain v. Town of Garden Grove,* 83 Iowa, 235, 48 N. W., 1031, 12 L. R. A., 482; *Swain v. Spokane,* 94 Wash., 616, 162 P., 991, L. R. A., 1917-D, 754, and *Wasser v. Northampton County,* 249 Pa., 25, 94 A., 444, L. R. A., 1915-F, 973, convince us that the law did not require that the defendants construct and maintain a railing that would resist and hold back the pressing power and force of an automobile. That is not its purpose, and while the requirement may embody more than a warning, it cannot be said to include the strength required to withstand the exertion of such unexpected power."

In *Eberhart v. R. Co.,* 34 Ga. App., 49, 129 S. E., 2, 4, the Court said: "There was no legal duty on the defendant company to construct the guard rails of the bridge sufficiently strong to withstand the impact of an automobile going at the rate of 20 to 25 miles per hour."

In 1 Blashfield Cyc. Auto. Law, 134, it is said:

"A railroad may be negligent in failing to provide a guard rail on a bridge at highway crossing, but a railroad is not required to construct and maintain a railing on an approach to such a bridge sufficiently strong to resist and hold back the pressing power of an automobile striking against it, especially if the automobile is going at a rapid rate of speed, as, for instance, from 22 to 25 miles an hour; and negligence cannot therefore be inferred from the fact that the railing gave way when the automobile collided with it.

"The law only requires that a highway bridge, with its approaches, over a railway, should be constructed and maintained so as to be reasonably safe for the ordinary means of travel."

In *Quigley v. R. Co.,* 234 Mich., 178, 207 N. W., 846, it was held that there was no obligation upon the part of the defendant to construct a fence so rigidly as to withstand the shock of an automobile driven against it; but the barriers or fences were for the purpose of warning travelers of the existence of dangerous conditions, and not for the purpose of withstanding the impact of heavy vehicles.

Our conclusions are:

(1) That the judgment in the case of E. S. Tennent, Jr., for $1,750.00 against all of the defendants, so far as it affects the railroad company, should be reversed, and the case remanded to the Circuit Court for the entry of a judgment in favor of the railroad company under Rule 27.

(2) That the judgment in the case of E. S. Tennent, Jr., for $1,750.00, against all of the defendants, so far as it affects the highway department, should be reversed, and

the case remanded to the Circuit Court for the entry of a judgment of nonsuit under Rule 27.

(3) That the order refusing the motion of the defendant railroad company for the direction of a verdict in its favor, in the case of E. S. Tennent, Sr., be reversed, and the case remanded to the Circuit Court for the entry of judgment in favor of the defendant railroad company under Rule 27; this disposition, renders the order for a new trial in that case, so far as it affects the interests of the railroad company, functus officio.

(4) That the entry of a judgment of nonsuit in the case of Tennent, Jr., in favor of the highway commission, renders the order for a new trial in the case of Tennent, Sr., so far as it affects the interests of the highway commission, *functus officio*.

The judgment of this Court is that the judgment and order appealed from be reversed, and that judgment in each case be rendered in favor of all of the defendants.

MR. CHIEF JUSTICE BLEASE and MR. JUSTICE STABLER concur in result.

MR. JUSTICE CARTER and MR. ACTING ASSOCIATE JUSTICE COSGROVE dissent.

MR. JUSTICE CARTER (dissenting) : I am unable to agree with the conclusion reached in the leading opinion. In my opinion the testimony adduced at the trial on the issues involved is susceptible of more than one reasonable inference, which made it incumbent upon the trial Judge to submit the case to the jury. I therefore dissent.

MR. ACTING ASSOCIATE JUSTICE COSGROVE (dissenting) : I join with Mr. Justice Carter in the foregoing conclusions. The father's case is governed by that of the son under the decision of the majority of the Court.